UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
COLORADO RIVER CUTTHROAT                   )
TROUT, CENTER FOR BIOLOGICAL               )
DIVERSITY, and NOAH GREENWALD,             )
                                          )
          Plaintiffs,                      )
                                          )
     v.                                    )          Civil Action No. 09-2233 (PLF)
                                          )
KEN SALAZAR, Secretary of the              )
Department of the Interior, and UNITED     )
STATES FISH AND WILDLIFE                   )
SERVICE,                                   )
                                          )
          Defendants.                      )
_____)


<u>OPINION</u>

The Colorado River Cutthroat Trout, the only trout indigenous to the upper

Colorado River basin, once occupied a range of approximately 21,386 stream miles throughout

western North America.  During the nineteenth and early twentieth centuries, the trout's

population levels plummeted, and its current habitat measures only 3022 miles.  Although its

population levels appear to have stabilized in recent decades, the trout continues to face various

threats.

On June 13, 2007, the U.S. Fish and Wildlife Service announced its finding that

listing the trout as endangered or threatened under the Endangered Species Act was not

warranted at this time.  Not Warranted Finding, 72 Fed. Reg. at 32,589.[1]  Plaintiffs Colorado

River Cutthroat Trout, Center for Biological Diversity, and Noah Greenwald have challenged the

_____

[1]      12-Month Finding for a Petition to List the Colorado River Cutthroat Trout as
Threatened or Endangered (the "Not Warranted Finding" or the "Finding"), 72 Fed. Reg. 32,589
(June 13, 2007), Administrative Record (A.R.) at 1.

FWS's finding, as well as a related legal memorandum by the Department of the Interior, as arbitrary and capricious and in violation of the Endangered Species Act.  Plaintiffs and defendants both moved for summary judgment, and defendants moved to dismiss plaintiffs' claim pertaining to the related legal memorandum.

Upon careful consideration of the parties' papers, applicable law, and the entire record in the case, the Court finds that the Not Warranted Finding was not contrary to the statute or arbitrary and capricious.[2]  The Court also finds that plaintiffs' challenge to the related legal memorandum has been mooted by the formal withdrawal of the memorandum by the agency. Therefore, by Order of September 28, 2012, the Court granted the defendants' motion for summary judgment as to the first claim, granted the defendants' motion to dismiss as to the second claim, and denied the plaintiffs' motion for summary judgment.  This Opinion explains the reasoning underlying that Order.

---

[2]    The papers reviewed in connection with the pending motions include: Plaintiffs' Complaint [Dkt. No. 1]; Defendants' Answer [Dkt. No. 12]; Defendants' Motion to Dismiss Second Claim ("Defs.' Mot. Dismiss") [Dkt. No. 16]; Defendants' Notice of Withdrawal of Solicitor's M-Opinion ("Notice of Withdrawal") [Dkt. No. 37]; Plaintiffs' Motion for Summary Judgment (Pls.' Mot. Summ.) [Dkt. No. 38]; Amicus Brief by Pacific Legal Foundation [Dkt. No. 42]; First Amicus Brief by State of Wyoming [Dkt. No. 43]; Defendants' Opposition to Plaintiffs' Summary Judgment Motion, Memorandum in Support of Cross-Motion for Summary Judgment, and Memorandum in support of Motion to Dismiss Second Claim ("Defs.' Mot. Summ.") [Dkt. No. 44], as amended by Cross-Motion for Summary Judgment [49]; Plaintiffs' Reply in support of Summary Judgment Motion and Opposition to Defendants' Summary Judgment Motion ("Pls.' Reply") [Dkt. No. 46]; Second Amicus Brief by State of Wyoming [Dkt. No. 47]; Defendants' Reply in Support of its Summary Judgment Motion ("Defs.' Reply") [Dkt. No. 48]; Defendants' Notice of Supplemental Authority [Dkt. No. 51]; Plaintiffs' Response to Notice of Supplemental Authority [Dkt. No. 52]; Plaintiffs' Notice of Supplemental Authority [Dkt. No. 53]; and Defendants' Response to Notice of Supplemental Authority [Dkt. No. 54].

# I. BACKGROUND

## A. Statutory and Regulatory Framework

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, is generally considered to be "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." In re Am. Rivers & Idaho Rivers United, 372 F.3d 413, 414 (D.C. Cir. 2004) (citing Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978)). The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] . . . a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b). The Department of the Interior, which is ultimately responsible for implementation of the ESA with respect to land-based and freshwater species, has delegated primary enforcement authority to the Fish and Wildlife Service ("FWS"), an agency within the Department of the Interior. See Spirit of Sage Council v. Norton, 294 F. Supp. 2d 67, 75 (D.D.C. 2003).

An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range[.]" 16 U.S.C. § 1532(6). A "threatened species" is "any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range[.]" 16 U.S.C. § 1532(20). The ESA provides for any "interested person" to petition the Secretary of the Interior to list a species as threatened or endangered, and the Secretary has 90 days to determine whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); see also 50 C.F.R. § 424.14. Within twelve months of receiving a petition that presents such substantial information, and after undertaking a

3

review of the species' status, the Secretary must publish findings in the Federal Register that

indicate whether the petitioned action is not warranted, warranted, or warranted but precluded.

16 U.S.C. § 1533(b)(3)(B)(i)-(iii).

The ESA directs the Secretary of the Interior to base the finding of whether a

species is "endangered" or "threatened" on:

> any of the following factors: (A) the present or threatened destruction,
> modification, or curtailment of its habitat or range; (B) overutilization for
> commercial, recreational, scientific, or educational purposes; (C) disease or
> predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other
> natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  FWS regulations further provide that this decision must be based on

"any one or a combination" of these factors and "solely on the best scientific and commercial

data available" after conducting a status review of the species.  50 C.F.R. § 424.11(c).  It is also

agency policy to solicit "independent peer review . . . on listing recommendations . . . to ensure

the best biological and commercial information is being used in the decision making process[.]"

Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities,

59 Fed. Reg. 34,270, 34,270 (July 1, 1994).

### B. Colorado River Cutthroat Trout

The Colorado River cutthroat trout, *Oncorhynchus clarkii pleuriticus* (the

"Trout"), is the only salmonid native to the upper Colorado River basin, and is one of fourteen

subspecies of cutthroat trout known to be native to interior regions of western North America.

Not Warranted Finding, 72 Fed. Reg. at 32,590.  The Trout exhibits orange or red slash parts on

both sides of the lower jaws, and sexually mature males are brightly colored.  Id.  At the

beginning of the nineteenth century, the Trout occupied a range of approximately 21,386 stream

miles, running through Wyoming, Colorado, Utah, New Mexico, and possibly Arizona.  Id.

Currently, the Trout occupies 3022 miles, or 14%, of its historic range, and is found in Colorado,

Utah, and Wyoming.  Id. at 32,600.

      The parties agree that a variety of threats, natural and manmade, can affect the

Trout and its habitat.  See Pls.' Mot. Summ. at 5-6 (citing grazing, dams and water diversions,

logging, oil and gas development, hybridization, disease, small and isolated populations, and

natural disasters); Defs.' Mot. Summ. at 12-13 (citing habitat fragmentation, population isolation

and loss of genetic diversity, hybridization, disease, random catastrophes, and land use activities

such as grazing and road-building).  Much of the initial decline in Trout distribution from its

historic range resulted from the stocking of nonnative sport fish, which "caused problems

through hybridization, competition, and predation."  Not Warranted Finding, 72 Fed. Reg. at

32,599.  This stocking occurred primarily in the late nineteenth and early twentieth centuries, is

no longer practiced by fish and wildlife agencies, and no longer occurs near most Trout

populations.  Id. at 32,599; see also Pls.' Mot. Summ. at 5.  In addition, states are implementing

programs to remove nonnative competitor species from Trout waters.  Id. at 32,597.

### C. Procedural History

      This action stems from a December 9, 1999, petition that plaintiffs filed with the

FWS to list the Trout as an endangered or threatened species.  See Colorado River Cutthroat

Trout v. Kempthorne, 448 F. Supp. 2d 170, 174 (D.D.C. 2006).  In October 2000, plaintiffs filed

suit in this Court, contending that the FWS violated the ESA by failing to issue the required

90-day finding on the petition.  Id.  In April 2004, the FWS issued the 90-day finding, which

concluded that the petition did not "present substantial information that listing the trout may be

warranted."  Id.; 90-Day Finding on a Petition to List the Colorado River Cutthroat Trout, 69

Fed. Reg. 21,151 (Apr. 20, 2004).  Plaintiffs then amended their complaint to challenge the

sufficiency of the 90-day finding.  Colorado River Cutthroat Trout v. Kempthorne, 448 F. Supp.

2d at 174.  The Court awarded summary judgment to the plaintiffs after finding that the FWS had

"solicited information and opinions from limited outside sources" rather than considering the

petition alone in making its decision, which rendered the FWS's consideration of the petition

"procedurally flawed."  Id. at 177.  Consequently, the Court ordered the FWS to conduct a "full

status review of the [Trout] within nine months . . . and issue a 12-month finding on the [Trout]"

after the status review and public comment period.  Id. at 179.

On November 7, 2006, the FWS announced the commencement of its status

review, which involved a public comment period through January 8, 2007, as well as two

scheduled public workshops.  12-Month Finding on a Petition to List the Colorado River

Cutthroat Trout as Threatened or Endangered, 71 Fed. Reg. 65,064, 65,065 (Nov. 7, 2006).

While the status review was underway, the then-Solicitor of the Department of the Interior issued

a memorandum defining "a significant portion of its range" as that term is used in the ESA.  See

M-37013, Solicitor's Memorandum Regarding Meaning of "In Danger of Extinction Throughout

All or a Significant Portion of its Range" (March 16, 2007) (the "Solicitor's Memorandum"),

[Dkt. No. 16-2].  On June 13, 2007, the FWS issued its 12-month finding, which announced that

the Trout "is not now in danger of extinction (endangered), nor is it likely to become endangered

within the foreseeable future (threatened)."  Not Warranted Finding, 72 Fed. Reg. at 32,600.

6

Accordingly, the FWS found that listing the Trout as a threatened or an endangered species under the ESA was not warranted at this time.  Id.  Although the FWS did not mention the Solicitor's Memorandum in its Finding, the FWS adopted an interpretation of "significant portion of its range" that was consistent with that set forth in the Solicitor's Memorandum.  On November 24, 2009, plaintiffs filed the instant case, challenging the FWS's Not Warranted Finding and the Solicitor's Memorandum under the ESA and the Administrative Procedure Act ("APA").

## II. LEGAL STANDARDS

### A. Endangered Species Act and Administrative Procedure Act

The ESA provides for judicial review of an agency's "not warranted" finding.  16 U.S.C. § 1533(b)(3)(C)(ii).  The APA provides the standard for judicial review of agency listing decisions.  See Am. Wildlands v. Kempthorne, 530 F.3d 991, 997 (D.C. Cir. 2008).  The reviewing court may set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2)(A).

The standard of review of agency action is "a highly deferential one."  Am. Wildlands v. Kempthorne, 530 F.3d at 997 (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976)).  There is a strong, albeit rebuttable presumption in favor of upholding decisions of the FWS in view of its expertise in the area of wildlife conservation and management and the deferential standard of review.  Colorado River Cutthroat Trout v. Kempthorne, 448 F. Supp. 2d at 174; see Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375-78 (1989).  If the agency has "considered the relevant factors and articulated a rational connection between the facts found

and the choice made," its decision cannot be considered arbitrary and capricious.  Colorado River Cutthroat Trout v. Kempthorne, 448 F. Supp. 2d at 174 (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 105 (1983)).  The Court's review, however, must be "searching and careful."  Nat'l Envtl. Dev. Assn's Clean Air Project v. E.P.A., 686 F.3d 803, 810 (D.C. Cir. 2012) (quoting Ethyl Corp. v. EPA, 541 F.2d at 36-37).

As explained in more detail below, one of plaintiffs' principal arguments challenges the FWS's interpretation of the ESA.  The court must defer to the agency's interpretation of a statute that it implements "so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language."  OSG Bulk Ships v. United States, 132 F.3d 808, 814 (D.C. Cir. 1998) (quoting Coal Emp't Project v. Dole, 889 F.2d 1127, 1131 (D.C. Cir. 1989)).  When the action under review involves an agency's interpretation of a statute that the agency is charged with administering, the court applies the familiar analytical framework set forth in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  Under step one of Chevron, the court asks "whether Congress has directly spoken to the precise question at issue, in which case we must give effect to the unambiguously expressed intent of Congress."  Sec'y of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d 1066, 1073 (D.C. Cir. 2007) (internal quotation marks and citation omitted); see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43.

If the court concludes that "the statute is silent or ambiguous with respect to the specific issue," the court moves "to the second [Chevron] step and defer[s] to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'"  Sec'y of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074

8

(quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843).  "A

'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the

stuff of which a 'permissible' construction is made."  Northpoint Tech., Ltd. v. F.C.C., 412 F.3d

145, 151 (D.C. Cir. 2005) (citing Cont'l Airlines v. Dep't of Transp., 843 F.2d 1444, 1452 (D.C.

Cir. 1998)). Therefore, the court must focus on "whether the [agency] has reasonably explained

how the permissible interpretation it chose is 'rationally related to the goals of' the statute." Petit

v. U.S. Dept. of Educ., 675 F.3d 769, 785 (D.C. Cir. 2012) (alteration in original) (quoting

Village of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 665 (D.C. Cir. 2011)).  "Unlike

our Chevron step one analysis, our review at this stage is 'highly deferential.'" Village of

Barrington, Ill. v. Surface Transp. Bd., 636 F.3d at 665 (citing Nat'l Rifle Assn of Amer. v. Reno,

216 F.3d 122, 137 (D.C. Cir. 2000)).

### B. Summary Judgment

Summary judgment may be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  In a case involving review of a final agency action under the APA, however, the

Court's role is limited to reviewing the administrative record; the standard set forth in Rule 56

does not apply.  See Catholic Health Initiatives v. Sebelius, 658 F. Supp. 2d 113, 117 (D.D.C.

2009), rev'd on other grounds, 617 F.3d 490 (D.C. Cir. 2010); Cottage Health Sys. v. Sebelius,

631 F. Supp. 2d 80, 89-90 (D.D.C. 2009).  "Under the APA, it is the role of the agency to resolve

factual issues to arrive at a decision that is supported by the administrative record, whereas 'the

function of the district court is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did.'" <u>Catholic Health Initiatives v. Sebelius</u>, 658 F. Supp. 2d at 117 (quoting <u>Cottage Health Sys. v. Sebelius</u>, 631 F. Supp. 2d at 90).  Summary judgment thus serves as "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  <u>Cottage Health Sys. v. Sebelius</u>, 631 F. Supp. 2d at 90 (citing <u>Richards v. INS</u>, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

## III.  ANALYSIS

### A. Claim 1: "Not Warranted Finding"

Plaintiffs claim that the FWS's Not Warranted Finding violates the ESA and is arbitrary and capricious, and therefore must be vacated.  Plaintiffs contend that the FWS acted unlawfully by allegedly (1) failing to consider whether the Trout's lost historic range and certain portions of the current range constitute "significant portion[s] of its range" as used in the ESA; (2) considering the ESA's listing factors in isolation, rather than in combination, to determine the severity of threats faced by the Trout; (3) failing to consider the impact of climate change in assessing threats to the Trout; (4) improperly considering voluntary conservation plans when reviewing existing regulatory protections for the Trout; (5) deviating from the ESA's requirement to employ the "best scientific and commercial data available"; and (6) erroneously analyzing the evidence in the record.  The Court addresses each of plaintiffs' challenges in turn.

1. The FWS's Interpretation of "Significant Portion of Its Range"

The ESA defines an endangered species as one "in danger of extinction throughout all or *a significant portion of its range*[.]"  16 U.S.C. § 1532(6) (emphasis added).[3] In its Not Warranted Finding, the FWS explicitly interpreted the term "range" as signifying the *current* range of the Trout, which measures 3022 miles.  The FWS explained:

> The Act does not indicate threshold levels of historic population size at which, as the population of a species declines, listing as either "threatened" or "endangered" becomes warranted. Instead, the principal considerations in the determination of whether or not a species warrants listing as a threatened or an endangered species under the Act are the threats that now confront the species and the probability that the species will persist in "the foreseeable future." . . . We evaluated the [Colorado River cutthroat trout] throughout its *current range* to determine if any portion is likely to become threatened or endangered within the foreseeable future, and if so, whether that portion is significant relative to the remainder of the species' range.

Not Warranted Finding, 72 Fed. Reg. at 32,599-600 (emphasis added).  The FWS proceeded to explain its interpretation of significance: "For an area to be significant, it must meaningfully contribute to the resilience, redundancy, or representation of a species."  Id. at 32,600.

Plaintiffs allege that the FWS violated the ESA by (1) failing to consider whether the lost portion of the Trout's *historic* range constitutes "a significant portion of its range", and (2) failing to explain why the portions of the current range occupied only by Trout that have interbred with other subspecies are deemed to be insignificant.

---

[3]      The statute likewise defines "threatened species" as one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range[.]" 16 U.S.C. § 1532(20).

a.  Failure to Consider the Trout's Lost Historic Range

The ESA does not define what constitutes a species' "range" nor what is considered "significant", leading courts to view the phrase "in danger of extinction throughout all or a significant portion of its range" as "inherently ambiguous".  See Defenders of Wildlife v. Norton, 258 F.3d 1136, 1141 (9th Cir. 2001); see also WildEarth Guardians v. Salazar, 741 F. Supp. 2d 89, 99 (D.D.C. 2010).  As the Ninth Circuit observed:

> Standing alone, the phrase "in danger of extinction throughout . . . a significant portion of its range" is puzzling. According to the Oxford English Dictionary, "extinct" means "has died out or come to an end . . . Of a family, class of persons, a race of species of animals or plants: Having no living representative." Thus, the phrase "extinc[t] throughout . . . a significant portion of its range" is something of an oxymoron.

Defenders of Wildlife v. Norton,  258 F.3d at 1141 (internal footnote omitted).

The question of whether a sizeable decline in historic range is "a significant portion of its range" under the ESA has received considerable attention in the last decade, as the FWS has persistently restricted the scope of 'range' to a species' current range and environmental groups have urged a broader reading.  See, e.g., Tucson Herpetological Soc'y v. Salazar, 566 F.3d 870, 876 (9th Cir. 2009); Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior, 354 F. Supp. 2d 1156, 1164-67 (D. Or. 2005); see also Defs.' Mot. Summ. at 15 ("The [FWS's] long standing view . . . is that "range" refers to areas currently occupied or used, and the determination of extinction risk is fundamentally forward looking").  In 2007, the Solicitor of the Department of the Interior issued a memorandum to the Director of the FWS, in which the Solicitor advised that "range" should be interpreted as referring only to a species' current range. See Solicitor's Memorandum at 7-8 ("The phrase 'is in danger' denotes a present-tense condition

12

of being at risk of a future, undesired event.  Hence, to say a species "is in danger" in an area

where it no longer exists . . . would be inconsistent with common usage").  Defendants also argue

that the size of a species' range generally grows and contracts over time; as a result, pinpointing

one fixed historic range would be an inherently arbitrary exercise.  See Defs.' Reply at 8 (noting

that one study identified the Trout's historic range as the habitat occupied 11,000 years ago,

while another looked to the habitat occupied two centuries ago).

      Several environmental groups, such as plaintiffs, have expressed concern that a

focus on the current range will lead to reduced protections for at-risk species, contrary to the

ESA's purpose.  See Pls' Mot. Summ. at 47-48.  Plaintiffs raise the possibility, for example, that

the interpretation of range as current range could "'create incentives that could work against

fundamental goals of the ESA' because 'regulators might be inclined to delay listing decisions in

the hope that critically endangered populations would disappear, allowing the current range of

the species to be recalibrated downwards.'" Pls.' Mot. Summ. at 47-48 (citing Robin S. Waples

et al., Legal Viability, Societal Values, and SPOIR: Response to D'Elia et al., 22 Conservation

Biology 1075, 1077 (2008), (Dkt. No. 38, Exh. 22)).  Plaintiffs also assert that the ESA expressly

instructs the agency to consider range or habitat that has recently been lost. Pls.' Mot. Summ. at

16; see 16 U.S.C. § 1533(a)(1) (requiring consideration of the "present or threatened destruction,

modification, or curtailment of [the species'] habitat or range").

      The Court acknowledges this tension but finds that the Ninth Circuit's approach

provides an instructive way to address it.  In Defenders of Wildlife v. Norton, 258 F.3d 1136 (9th

Cir. 2001), the Ninth Circuit examined the Secretary of the Interior's decision not to designate

the flat-tailed horned lizard as threatened under the ESA, despite a loss of 34 percent of the

lizard's historic range over the twentieth century.  Id. at 1141.  The court did not rule on whether

"range" should be equivalent to historic range or current range, nor did it lay out a definition for

the term "significant".  It did find, however, that the FWS was required to explain its reasons for

finding that the lost range was not significant:

> [A] species can be extinct 'throughout . . . a significant portion of
> its range' if there are major geographical areas in which it is no
> longer viable but once was . . . The Secretary necessarily has a
> wide degree of discretion in delineating 'a significant portion of its
> range,' since the term is not defined in the statute.  But where, as
> here, it is on the record apparent that the area in which the lizard is
> expected to survive is much smaller than its historical range, *the
> Secretary must at least explain her conclusion that the area in
> which the species can no longer live is not a 'significant portion of
> its range.*

Id. at 1145 (citing Asarco, Inc. v. EPA, 616 F.2d 1153, 1159 (9th Cir. 1980)) (emphasis added).

The Ninth Circuit revisited the case of the flat-tailed horned lizard in Tucson

Herpetological Soc'y v. Salazar, 566 F.3d 870, 876 (9th Cir. 2009).  In reviewing the FWS's

decision not to list the lizard as threatened, the Ninth Circuit found that the Secretary had

"analyze[d] the lizard's lost habitat in a site-specific manner" and had reasonably concluded that

the lost portions of the range "[did] not provide any unique or critical function for the well-being

of the species[.]"  Id. at 877.  The Ninth Circuit also found persuasive the Secretary's observation

that much of the lost range had been converted to other uses decades before and generally was

not recoverable, and was "thus of limited significance to the lizard's long-term survival."  Id. at

868.  Because the FWS had explained its conclusion that the lost range was not a "significant

portion of its range", and in light of the deferential standard of review, the court upheld the

agency's decision.

Other judges in this District have adopted the Ninth Circuit's approach of requiring that the FWS provide some reasoning for why a historical contraction in range does not reflect a "risk of extinction throughout . . . a significant portion of its range[.]" 16 U.S.C. § 1532(6). See Defenders of Wildlife v. Norton, 239 F. Supp. 2d 9, 20 (D.D.C. 2002) (Kessler, J.), vacated in part on other grounds, 89 Fed. Appx. 273 (D.C. Cir. 2004) (vacating and remanding finding in part because FWS failed to explain its conclusion that three out of four discrete geographic areas historically inhabited by Canada Lynx were not "significant"); WildEarth Guardians v. Salazar, 741 F. Supp. 2d at 98-101 (Kollar-Kotelly, J.) (vacating and remanding finding where FWS failed to explain why a 50 to 87 percent reduction in Utah prairie dog's range was not significant).

In this case, the FWS explicitly defined the term "range" as signifying the Trout's *current* range of approximately 3022 miles. See Not Warranted Finding, 72 Fed. Reg. at 32,599-600. Despite plaintiffs' contentions, however, the FWS also provided an adequate analysis of the Trout's historic range and discussed why the historic contraction of its range does not render the Trout vulnerable in any significant portion of its currently occupied habitat. 72 Fed. Reg. at 32,590. Although the Trout's current distribution is "approximately 14 percent of probable historically occupied stream miles" the FWS explained that the Trout are well-distributed throughout this area. Id. The FWS further explained that the loss in population over the last 200 years occurred primarily in the late nineteenth and early twentieth centuries, as a result of nonnative sport fish stocking. Id. at 32,597-99. The FWS did not find evidence of recent declines in the overall distribution or abundance of the Trout, but rather found evidence that the number of known populations is increasing. Id. at 32,599. Plaintiffs argue that the FWS may not

simply "point to one area or class of areas where [Trout] populations persist to support a finding

that threats to the species elsewhere are not significant; the ESA requires a more thorough

explanation." Pls' Mot. Summ. at 17 (quoting <u>Tucson Herpetological Soc'y v. Salazar</u>, 566 F.3d

at 876). This Court concludes, however, that the FWS, in analyzing the distribution of the

Trout's current range, identifying recent population trends, and detailing the cessation of the

primary cause of past reduction, has provided that more thorough explanation.

   b.   Failure to Consider Unoccupied Portions of the Trout's Current Range

          Even if "range" is restricted to the Trout's current range of 3022 miles, plaintiffs

take issue with the FWS's conclusion that the Trout are not threatened within a "significant

portion" of this area. Where a species or subspecies is unlikely to survive in a sizeable portion of

its current habitat, the agency must provide some explanation as to why this portion is not "a

significant portion of its range[.]" <u>Defenders of Wildlife v. Norton</u>, 239 F. Supp. 2d at 21 (citing

<u>Defenders of Wildlife v. Norton</u>, 258 F.3d at 1145); <u>see</u> <u>Southwest Center for Biological</u>

<u>Diversity v. Norton</u>, 98-cv-0934 (D.D.C. May 24, 2004) (instructing FWS to reconsider and

explain whether an island constituting one-third of species' range was "significant"). Plaintiffs

point to the 1226 miles throughout the current range that lack populations of genetically pure (or

close-to-pure) Trout and argue that the FWS "failed to evaluate the significance of the fact that

almost half of its remaining range is unoccupied." Pls.' Mot. Summ. at 1.

          Although the FWS did not state explicitly that it found these 1226 miles not to be

a "significant portion" of the range, the FWS clearly articulated how it evaluated significance

throughout the Finding and in a subsection entitled "significant portion of the range". The FWS

explained that it had identified fish populations that met a 90 percent threshold of Trout genetic

content, such that the populations were unquestionably Trout on a genetic and morphological

level.  Not Warranted Finding, 72 Fed. Reg. at 32,591.[4]  The 285 Trout populations that met this

standard were considered "Conservation Populations".  Id.[5]  The FWS then evaluated the threats

facing these Conservation Populations in each of the eight major watershed-based regions within

the range, otherwise known as Geographical Management Units, or "GMUs".  Finding that at

least some number of Conservation Populations were likely to survive in each GMU, the agency

concluded that the Trout was not endangered or threatened within "a significant portion of the

range[.]"  Id. at 32,600.

Each GMU contains large areas – in the aggregate, approximately 1226 miles or

41 percent of the total range – occupied by cutthroat trout sport fish populations.  These sport

fish populations have the morphological characteristics of the Trout, but they generally contain

greater than 10 percent genetic material from other subspecies.  Not Warranted Finding, 72 Fed.

Reg. at 32,591.  The FWS noted that several state agencies include these sport fish populations in

their conservation and management plans for the Trout.  Id. at 32,598.  Because of their relatively

high level of nonnative genetic material, however, the FWS does not consider the sport fish

populations to be predictive of the survival of the Trout in its genetically pure form.  Id. ("Sport

fish populations . . . conform morphologically . . . to the scientific taxonomic description of [the

Trout], but do not meet the additional criteria of "conservation" or "core" populations and hence

---

[4]     Morphology "refers to the general aspects of biological form and arrangement of the parts of a plant or an animal."  Encyclopœdia Britannica Online Academic Edition. (Oct. 12, 2012), http://www.britannica.com/EBchecked/topic/392797/morphology.

[5]     A subset of Conservation Populations were "Core Conservation Populations", which had greater than 99 percent Trout genes.

are managed for their value as a sport fish population rather than their value to the conservation of the subspecies.").

Plaintiffs argue that the FWS failed to explain why these regions containing sport fish populations do not constitute "a significant portion of its range[.]"  The Court agrees that the FWS was often unclear as to whether it considered these sport fish populations to constitute Trout at all.[6]  It is established, however, that a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," as it may be here.  Building Industry Assn of Superior Cal. v. Babbitt, 979 F. Supp. 893, 898 (D.D.C. 1997) (citing Motor Vehicles Mfrs. Assn v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43 (1983)).  This Court finds that the FWS's explicit discussion of how it evaluated significance, accompanied by its explanation of those areas of the range occupied by Trout sport fish populations, renders discernible the FWS's reasoning with respect to its evaluation of a significant portion of the Trout's range.

Plaintiffs also allege that the FWS failed to explain adequately its use of "GMUs" as the analytic tool for determining whether the Trout is threatened in a significant portion of its range.  Pls.' Mot. Summ. at 21.  The FWS, however, provided a reasonable basis for its selected methodology, explaining that the eight GMUs correspond to the major watersheds within the range, and that "standardized fish monitoring methods are watershed based."  Not Warranted Finding, 72 Fed. Reg. at 32,600; see also id. at 32,593 (noting that under Wyoming agency plan, biologists manipulate habitat on a watershed scale).  The FWS noted that the eight GMUs encompass the entire current and historical range, and Conservation Populations are located in

---

[6]     Defendants concede that the inclusion of sport fish populations in the current range leads to analytic confusion when evaluating Trout sustainability within the range.  See Defs.' Reply Mot. at 12.

every GMU.  Id. at 32,600.  The FWS also explained that "[n]o significant ecological differences exist at levels smaller than the GMUs to affect representation of the subspecies."  Id.  The FWS concluded that a sufficient number of GMUs existed in order to ensure Trout redundancy and resiliency.  Id.  Although the plaintiffs raise plausible criticisms of the methodology chosen by the FWS, an agency's choice of methodology need only be reasonable to be upheld.  See Nat'l Envtl. Dev. Assn's Clean Air Project v. E.P.A., 686 F.3d 803, 810 (D.C. Cir. 2012) ("[W]e do not look at the decisions as would a scientist, but 'as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'").  This Court concludes that the FWS's use of GMUs, and its explanation for their use, pass this test.

### 2. Failure to Address Threats in Combination

Under its regulations, the FWS must consider threats posed by "any one or a combination" of the five factors listed in the ESA. 16 U.S.C. § 1533(a)(1)(A)-(E); see 50 C.F.R. § 424.11(c); Carlton v. Babbitt, 900 F. Supp. 526, 530 (D.D.C. 1995).  These factors are:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

19

Plaintiffs claim that the FWS violated the ESA's requirement to consider the listing factors in combination.  Indeed, in most of its Finding, the FWS considers each of the listing factors one by one and determines that the threats do not rise to the level requiring listing.  See, e.g., Not Warranted Finding, 72 Fed. Reg. at 32,594 ("[W]e conclude . . . that present or threatened destruction, modification, or curtailment of habitat or range has not affected the status of [Trout] to the extent that listing under the Act as a threatened or endangered species is warranted at this time."); id. at 32,594 ("[I]t does not appear that predation affects the status of [the Trout] to the extent that listing under the Act as threatened or endangered is warranted at this time."); id. at 32,596 ("[W]e conclude . . .  that any identified inadequacies of existing regulatory mechanisms have not affected the status of [the Trout] to the extent that listing under the Act as a threatened or endangered species is warranted.").  Plaintiffs assert that the Finding resembles the finding vacated and remanded by Judge Kollar-Kotelly in WildEarth Guardians v. Salazar,741 F. Supp. 2d at 102, because, as in that case, the finding here does not "explicitly indicate that [the FWS] analyzed the listing factors' cumulative effect."  Pls.' Mot. Summ. at 28-29.  Defendants maintain, by contrast, that in this case the FWS did in fact consider threats in combination, but did so in its discussion of the individual factors, rather than in a separate cumulative effects section.  Defs.' Mot. Summ. at 31-32.

The FWS's analysis of how the listing factors interact is cited throughout the Finding in a somewhat haphazard fashion, but the analysis of how they combine together nevertheless is apparent.  For example, under the subsection discussing Factor E (other natural or manmade factors affecting the Trout's continued existence), the FWS considered a general population health evaluation for each Conservation Population.  Not Warranted Finding, 72 Fed.

Reg. at 32,596-97.  This population health evaluation considered population size, temporal variability, population connectivity and production potential, which was based on estimates of "habitat quality, presence of nonnative fishes, disease, and land-use impacts[.]"  Id.; see also Christine L. Hirsch, Shannon E. Albeke, and Thomas P. Nesler, Range-Wide Status of Colorado River Cutthroat Trout (March 2006) ("2006 Range-Wide Status Report" or "Report"), A.R. at 1429 (discussing formulation of population health evaluation).  This metric thus considers Factor A (present or threatened destruction of habitat or range) in combination with Factor C (disease or predation) and Factor E (other factors, such as connectivity issues).  In addition, the FWS considered the interaction of habitat fragmentation (Factor A) with the exchange of genetic information (Factor E).  72 Fed. Reg. at 32,596.  The FWS also discussed how the Trout's widespread populations (Factor A) are more vulnerable to threats like fire, flood, and drought (Factor E), as well as how this fragmentation protects the Trout from such threats as disease and overfishing (Factors B and C).  72 Fed. Reg. at 32,593-94, 32,596.

The FWS certainly could have been more explicit in articulating the manner in which it considered how factors might combine together to intensify or mitigate threats to the Trout by outlining its analysis of combined effects in a separate section.  Nevertheless, the agency's reasoning can be reasonably discerned here.  See Building Industry Assn of Superior Cal. v. Babbitt, 979 F. Supp. at 898.  The FWS's findings – particularly those relating to the general population health evaluations – adequately demonstrate a consideration of the listing factors in combination, and therefore must be upheld.

3. Failure to Address Climate Change Effects

Plaintiffs contend that the FWS should have considered the impact of climate change in its assessment.  Plaintiffs argue that "climate change will cause significant additional reductions in suitable habitat and will especially impact the majority of the Conservation Populations because of their small size."  Pls.' Mot. Summ. at 30.

Although the ESA does not expressly require consideration of climate change effects, it does direct the agency to address "natural or manmade factors affecting [a species'] continued existence."  16 U.S.C. § 1533(a)(1)(E).  As scientific assessments increasingly incorporate in-depth analyses of climate change effects, explicit consideration of climate change-related threats may become a necessary component of the status review.  The record in this case, however, contains only occasional references to climate change-related threats.  There is no statutory requirement that the FWS discuss climate change in its listing decisions, and the Court is reluctant to impose a judicially-created requirement where, as here, climate change is not discussed at length in the record, where the issue was not raised by plaintiffs in their comments to the FWS, and where the record is ambivalent as to its effects.  Compare 2006 Range-Wide Status Report at 16 ("If global climate change results in shrinkage of [Trout] habitat to higher elevations . . . there may be opportunity to establish new self-sustaining populations in lakes and streams that were previously too cold for trout recruitment"), with M.K. Young, Colorado River Cutthroat Trout: A Technical Conservation Assessment (2006), A.R. at 9397 (describing climate change as "greatest future threat to the persistence of this species" because of effects on stream movement).

4. Improper Consideration of Regulatory Management Plans

Plaintiffs next assert that the FWS improperly relied on the voluntary Colorado River Cutthroat Trout Conservation Strategy ("Conservation Strategy") undertaken by the FWS in conjunction with Colorado, Utah, and Wyoming.  See Conservation Strategy for Colorado River Cutthroat (June 2006), A.R. at 1100;  Conservation Agreement and Strategy for Colorado River Cutthroat (Apr. 2001), A.R. at 1124.  The Conservation Strategy, first initiated in 1997 and adopted in 2001, operates to eliminate and reduce "[t]hreats that warrant [Trout] listing as a special status species by state and federal agencies and might lead to listing under the Endangered Species Act."  Conservation Strategy for Colorado River Cutthroat (June 2006) at 3, A.R. at 1102.  Much of the increase in Trout populations observed in the Not Warranted Finding appears to have occurred after this strategy was put into place.  See Not Warranted Finding, 72 Fed. Reg. at 32,599 (citing 2006 Range-Wide Status Report for "evidence of a substantial increase in the number of known populations"); 2006 Range-Wide Status Report at 62 (showing dramatic increases in numbers and miles/acres of Conservation Populations between July 1998 and July 2003).

In its Not Warranted Finding, the FWS noted that the voluntary agreements under the Conservation Strategy "do not qualify as a regulatory mechanism" and that the FWS could not base its finding on a "promised or anticipated result of conservation actions[.]"  Not Warranted Finding, 72 Fed. Reg. at 32,596.  Plaintiffs accuse the FWS of relying on the Conservation Strategy indirectly, however, and cite a Forest Service report that observes that its specific Trout management plans "have largely been superseded by [the Conservation Strategy.]" Pls.' Mot. Summ. at 10-11 (citing M.K. Young, Colorado River Cutthroat Trout: A Technical

Conservation Assessment 14 (2006), A.R. 9407.  But plaintiffs have pointed to no evidence showing that the legal classification of the Trout as a "sensitive species" or "species of concern" by regulatory agencies has been altered by the Conservation Strategy, which suggests that these agencies remain obligated to provide monitoring and protection for the Trout.  And while the FWS cannot rely on promised and unenforceable conservation agreements in evaluating existing regulatory mechanisms, see Biodiversity Legal Found. v. Babbitt, 943 F. Supp. 23, 26 (D.D.C. 1996), its consideration of the Conservation Strategy as part of its overall assessment of ongoing management practices is not inappropriate.  See Not Warranted Finding, 72 Fed. Reg. at 32,597 (noting, in its discussion of Factor E, that state resource agency programs that prohibit sport fish stocking and actively remove sport fish contribute to the maintenance of current Trout habitat).

### 5. Failure to Use Best Science Available

Plaintiffs contend that the FWS violated the ESA's mandate to make a listing decision based on "the best scientific and commercial data available[.]"  See 16 U.S.C. § 1533(b)(1)(A).  Plaintiffs take issue with certain methodologies used in the 2006 Range-Wide Status Report, which was conducted by a team of biologists from the FWS, U.S. Bureau of Land Management, U.S. Forest Service, Wyoming Game and Fish Department, Utah Division of Wildlife Resources, and Colorado Division of Wildlife.  Plaintiffs first criticize the Report for lacking "a threats analysis" specific to the 285 Conservation Populations.  Pls.' Mot. Summ. at 22.  Because this analysis is absent from the Report, plaintiffs assert that the FWS was required to undertake its own analysis on this issue.

The D.C. Circuit distinguishes "best scientific data available" from "best scientific data possible."  Building Industry Assn of Superior Cal. v. Norton, 247 F.3d 1241, 1246 (D.C.

24

Cir. 2001). "The [FWS] may not base its listings on speculations or surmise or disregard superior data," but "occasional imperfections do not violate [the ESA]." Id. at 1246-47. The requirement to use the best available data "makes it clear that the Secretary has no obligation to conduct independent studies." Am. Wildlands v. Kempthorne, 530 F.3d at 998 (quoting Southwest Center for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000)).

Although an individual threats assessment of each Conservation Population would certainly have been useful, it is not required under the statute. See 16 U.S.C. § 1533(a)(1)(A) (directing the Secretary to analyze threats to species' habitat or range, but not mandating a particular approach or methodology). The FWS instead relied upon the best data available, including the 2006 Range-Wide Status Report, which was peer reviewed in 2006. See Pls.' Mot. Summ. at 10 (citing A.R. at 8692). The Court finds that the FWS met its statutory requirement to make a listing decision based on "the best scientific and commercial data available."

Plaintiffs next contend that the FWS improperly relied on a "persistence" analysis to assess threats to the species' survival, contrary to its obligation to use the best available science.[7] Plaintiffs claim that Trout "persistence" does not indicate future survival and therefore cannot provide the appropriate metric to determine whether a species is "in danger of extinction." Pls.' Mot. Summ. at 31 (citing 16 U.S.C. § 1532(6), (19)); see also Natural Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 371 (E.D. Cal. 2007) (rejecting agency's finding that a species

---

[7]     FWS previously has defined "persistence" as "continuing captures of [a species or subspecies] over multiple generations at previously documented sites throughout the historical range." Friends of Blackwater v. Salazar, 691 F.3d 428, 431 (D.C. Cir. 2012) (alteration in original) (quoting Final Rule Removing the Virginia Northern Flying Squirrel (Glaucomys sabrinus fuscus) From the Federal List of Endangered and Threatened Wildlife, 73 Fed. Reg. 50,226, 50,227 (Aug. 26, 2008)). A viability assessment is a model that identifies minimum population sizes for a particular species. 73 Fed. Reg. at 50,227-28.

"persisted" when that persistence was at a level near extinction).  Plaintiffs argue that the FWS

was obligated to perform a viability assessment similar to that performed for the Rio Grande

cutthroat trout.

Plaintiffs' argument fails on several counts.  First, our court of appeals recently

held that use of data on a species' "persistence" is not inconsistent with the FWS' obligation to

use the "best . . . data available."  See Friends of Blackwater v. Salazar, — F.3d —, 2012 WL

3538236, at *5 (D.C. Cir. Aug. 17, 2012) (rejecting plaintiffs' contention that FWS was required

to use population-based criterion instead of persistence data in delisting decision).  Furthermore,

the Court finds that the FWS, in fact, did not rely exclusively on data relating to the Trout's

persistence, but instead used various metrics to assess threats to the Trout, including general

population health.  See Not Warranted Finding, 72 Fed. Reg at 32,596.  Finally, the FWS

addressed in the Not Warranted Finding why it declined to undertake a viability analysis here.

Id. at 32,592 (stating that the 2006 Range-Wide Status Report was more comprehensive than the

viability criteria developed to evaluate Rio Grande cutthroat trout).

Because the FWS has provided a reasoned explanation of its methodology, the

Court will not second-guess its decision to forego a Rio Grande cutthroat trout-style viability

analysis.  "Judicial 'deference to the agency is greatest when reviewing technical matters within

its area of expertise, particularly its choice of scientific data and statistical methodology.'"  Fund

for Animals v. Babbitt, 903 F. Supp. 96, 114 (D.D.C. 1995) amended, 967 F. Supp. 6 (D.D.C.

1997) (quoting State of Louisiana ex rel. Guste v. Verity, 853 F.2d 322, 329 (5th Cir. 1988)).

Although the plaintiffs may disagree with the science or the methodology the FWS elects to use,

absent a statutory mandate that requires a particular methodology, the agency's choice of

methodology need only be "reasonable" to be upheld.  See Am. Wildlands v. Kempthorne, 530 F.3d at 998-99.

Finally, plaintiffs claim that the FWS failed to follow its own peer review procedures, contrary to the ESA's requirement to rely on the best available science.  Plaintiffs point to the FWS's Peer Review Policy, which provides that the FWS will solicit "[i]ndependent peer review . . . on listing recommendations."  Pls.' Mot. Summ. at 33 (citing Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities, 59 Fed. Reg. 34,270, 34,270 (July 1, 1994)).  Although the 2006 Range-Wide Status Report was peer-reviewed, plaintiffs argue that this does not satisfy the FWS's obligation to conduct an independent peer review of the Finding itself.  As this Court has previously found, however, the FWS's peer review policy "is not an APA promulgated regulation of the sort held to be enforceable against an agency."  Building Industry of Superior California v. Babbitt, 979 F. Supp. at 905.  The FWS's listing decision "cannot be overturned based on the FWS's alleged noncompliance with its own, nonbinding policy statements."  Id.

### 6. Erroneous Analysis of the Evidence in the Record

Plaintiffs' remaining arguments go the FWS's scientific conclusions about the state of the Trout.  The Supreme Court has made clear that where a determination "requires a high level of technical expertise, [a court] must defer to the informed discretion of the responsible federal agencies." Marsh v. Oregon Natural Res. Council, 490 U.S. at 377 (citing Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)).  Nonetheless, "the presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not

reasoned." Defenders of Wildlife v. Babbitt, 958 F. Supp. at 679 (citing ALLTEL Corp. v. FCC, 838 F.2d 551, 562 (D.C. Cir. 1988)).

Plaintiffs assert that the FWS's analysis of the listing factors is contradicted by the record and therefore is arbitrary and capricious. In particular, plaintiffs focus on the negative effects of various land use activities and the habitat quality rankings, and the FWS's "improper" assessment of the "seriousness of small population size and isolation." Pls.' Mot. Summ. at 25-26.

In the Not Warranted Finding, however, the FWS provided a lengthy analysis of "Fragmentation and Isolation of Small [Trout] Populations in Headwater Areas" under Factor E, finding that the problems associated with small isolated populations ("increased risk of extirpation by catastrophic events and the loss of genetic exchange") were mitigated by the Trout's "widespread geographic distribution." Not Warranted Finding, 72 Fed. Reg at 32,596; see also id. at 32,587 (discussing the benefits of isolated populations, which are "less susceptible to introgression and competition from nonnative fish"). The FWS addressed the threat of land use activities on Trout survival through its examination of habitat quality for currently occupied habitat, id. at 32,592, and reasonably noted that "the mere presence of an activity within a stream segment that hosts a conservation population is not sufficient evidence to conclude that the population is threatened." 72 Fed. Reg at 32,593. The Service also observed that other factors "such as distribution and abundance, and recent trends" must be considered when determining the vulnerability of a population. Id. ("Otherwise, logic would dictate that every species that comes into contact with managed landscapes is threatened by those human influences.").

In light of the FWS's reasoned explanation, its support in the Administrative Record, and the deference afforded to the agency's scientific findings, the Court cannot say that the agency's conclusions about the threats facing the Trout are unreasonable or contradicted by the record.

\*   \*   \*

In sum, the plaintiffs have not shown that the FWS acted in an arbitrary and capricious manner, abused its discretion, or otherwise acted in violation of the statute, in finding that listing the Colorado River cutthroat trout as "threatened" or "endangered" under the Endangered Species Act is not warranted at this time.  The Court finds that the FWS has adopted a reasonable interpretation of the statute and provided adequate explanations for its decision, and that the record does not contradict the agency's factual findings or methodological choices.

### B. Claim 2: Legal Memorandum from the Solicitor of the Department of the Interior

Plaintiffs' second claim presents a facial challenge to the Solicitor's Memorandum analyzing the meaning of the phrase "significant portion of its range" in the Endangered Species Act, which plaintiffs contend heavily influenced the Not Warranted Finding challenged in the first claim.  Plaintiffs allege that the Solicitor's Memorandum violated the plain meaning of the ESA, and that it was issued in violation of the ESA's notice and comment procedures.

The FWS initially filed a motion to dismiss the second claim for failure to state a claim, arguing that the memorandum was not a final agency action and therefore was not judicially reviewable.  On May 5, 2011, however, the current Solicitor of the Interior formally withdrew the Memorandum in its entirety.  <u>See</u> Federal Defendants' Notice Regarding

Withdrawal of Solicitor's Opinion [Docket No. 37].[8]  The Solicitor announced that the FWS

intended to develop new guidance on how to apply the "significant portion of its range" phrase in

its listing decisions, id., and it initiated the process by which to do so in December 2011.[9]  The

briefing on defendants' motion to dismiss was incorporated into the summary judgment briefing,

in which the plaintiffs argued that this Court retained jurisdiction to review the Memorandum's

legality, and defendants argued that plaintiffs' second claim should be dismissed as moot.

      The Court agrees with defendants and finds that it must dismiss as moot the

plaintiffs' challenge to the withdrawn Solicitor's Memorandum, as this Court cannot order any

relief that the agency has not already provided.

      Federal courts only have jurisdiction over "cases" and "controversies."  U.S.

Const. art. III, § 2, cl. 1.  Consequently, they can resolve only "real and substantial

controvers[ies] admitting of specific relief through a decree of a conclusive character[.]"

Pharmachemie B.V. v. Barr Labs., Inc., 276 F.3d 627, 631 (D.C. Cir. 2002) (alterations in

original) (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990)).  A federal court must

dismiss a claim as moot whenever "events have so transpired that the decision will neither

presently affect the parties' rights nor have a more-than-speculative chance of affecting them in

the future."  Id. (quoting Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990)).

---

[8]    The withdrawal occurred after at least two district courts rejected an application, not relevant here, of the Solicitor's interpretation. See Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207 (D. Mont. 2010) (rejecting FWS's listing of wolves only in one state); WildEarth Guardians v. Salazar, CV-09-0574, 2010 WL 3895682 (D. Ariz. 2010) (rejecting FWS's conclusion that prairie dog species warranted listing only through specific region).

[9]    The Department of the Interior has proposed a new rule through notice-and-comment rulemaking procedures. See Draft Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species". 76 Fed. Reg. 76,987 (Dec. 9, 2011).

Plaintiffs, citing the "voluntary cessation" exception to the mootness doctrine, claim that the Court should not dismiss this claim.  "'It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice[.]'" Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 25-26 (D.C. Cir. 2006) (citing Worth v. Jackson, 451 F.3d 854, 860 (D.C. Cir. 2006)).  A claim challenging a voluntarily ceased practice is only moot when "(1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Qassim v. Bush, 466 F.3d 1073, 1075 (D.C. Cir. 2006) (quoting Motor & Equip. Mfrs. Assn v. Nichols, 142 F.3d 449, 459 (D.C. Cir. 1998)) (quotation marks omitted).  Therefore, a claim challenging a ceased practice is not moot if the practice is likely to recur or if the relief sought remains available.

As the Supreme Court has said, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000); see also Am. Bar Assn v. FTC., 636 F.3d 641, 648 (D.C. Cir. 2011).  Nevertheless, there must be "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." Air Line Pilots Assn Intern. v. Northwest Airlines, Inc., 199 F.3d 477, 486 (D.C. Cir. 1999) (quoting United States v. W.T. Grant Co., 345 U.S. at 632-33). Whether a practice is likely to recur is a factual matter.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 193.

Plaintiffs assert that it is reasonably likely that the FWS's new interpretation of "significant portion of its range" will be the same as the one stated in the withdrawn memorandum, but this assertion is not based on any actions or statements by the defendant.  See Nat'l Assn of Home Builders v. Salazar, 827 F. Supp. 2d 1, 6 (D.D.C. 2011) (considering whether withdrawal mooted a home builders' association's facial challenge to the Memorandum's validity and finding "no reasonable expectation that the conduct will recur"). The defendants here have not engaged in a pattern of illegal conduct or indicated that they will reinstate the challenged policy when litigation ends.  Instead, they have announced their intention to develop a new policy in accordance with the ESA and initiated a transparent rulemaking process, which is not yet complete.[10]

Plaintiffs incorrectly assert that injunctive and declaratory relief is still available. Although plaintiffs seek to have this Court vacate other listing decisions that relied on the Solicitor's Memorandum, challenges to the FWS's use of the legal interpretations in that memorandum are properly brought through individual actions seeking review of specific listing decisions, as the first claim was brought here.  Plaintiffs also contend that this Court may issue declaratory relief by declaring incorrect the legal analysis contained in the Solicitor's Memorandum.  This Court, however, refuses to issue an impermissible advisory opinion, whose only effect would be to constrain the FWS's reinterpretation of the phrase in the future.  See Flast

---

[10]     Plaintiffs unpersuasively argue that this case is similar to Defenders of Wildlife v. Salazar, 842 F. Supp. 2d 181 (D.D.C. 2012), in which Judge Kessler found that a challenge to agency regulations was not mooted by the cancellation of agency agreements made under that regulation.  In that case, however, the challenged agency action (the regulations) remained in effect, whereas here the challenged agency action (the Solicitor's Memorandum) has been withdrawn.

v. Cohen, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.").  Accordingly, plaintiffs' second claim is dismissed as moot.

## IV. CONCLUSION

For the reasons set forth above, and in accordance with the Order issued September 28, 2012, the Court grants the defendants' motion to dismiss plaintiffs' second claim, albeit on different grounds than those first proposed in defendants' motion, grants the defendants' motion for summary judgment with respect to plaintiffs' first claim, and denies plaintiffs' motion for summary judgment.

/s/_____
PAUL L. FRIEDMAN
DATE:   October 16, 2012                United States District Judge